1
2
3                    UNITED STATES DISTRICT COURT
4                         DISTRICT OF NEVADA
5                                * * *
6    JOSEPH WILLIAMS,                    Case No. 3:22-cv-00197-MMD-CSD
7                          Plaintiff,              ORDER
8         v.
9    CITY OF SPARKS, *et al.*,
10                        Defendants.
11
12   **I.    SUMMARY**
13        In the early morning of May 5, 2020, police officers shot and injured Plaintiff

14   Joseph Williams after a lengthy pursuit in Sparks, Nevada. Williams brings seven claims

15   against Defendants City of Sparks ("City") and Sparks Police Department ("SPD")

16   officers Christopher Bare, Christopher Rowe, Mateo Terrasas, Charles Colborn, Nathan

17   Janning, Vernon Taylor, and Austin Gibson (collectively, "Officers"). Before the Court

18   are two motions: Defendants' partial motion to dismiss (ECF No. 17)[1] and Defendants'

19   motion for summary judgment (ECF No. 20).[2] As explained further below, the Court will

20   grant Defendants' partial motion to dismiss with leave to amend, and will grant in part

21   and deny in part Defendants' motion for summary judgment.

22   ///
23   ///
24   ///
25

26        [1]Williams responded (ECF No. 23) and Defendants replied (ECF No. 24).

27        [2]Williams responded (ECF No. 33) and Defendants replied (ECF No. 35). The
     Court has reviewed Defendants' notice of manual filing and the accompanied video
28   recordings (ECF No. 21).

1

## II.    BACKGROUND

2       The Court highlights only the most salient details concerning the events of the

3   evening in question, which mostly occurred within a timeframe of about 40 minutes.[3]

4   (ECF No. 20-6 at 0:34-43:42.) Defendants rely on the SPD dispatch logs, 911 call audio

5   recording, affidavits, and video recordings captured from the Officers' dash cams and

6   body cams as support, while Plaintiff offers his declaration as support in response.

7       ### A.    The Incident: May 5, 2020

8           #### 1.    The Initial 911 Call

9       On May 5, 2020, at around 12:10 AM, SPD Dispatch received a 911 call

10  reporting that a male suspect had just stolen alcohol from a local gas station and

11  convenience store, and that he was "vandalizing" a car in the store's parking lot. (ECF

12  Nos. 20-2 at 4, 20-3 at 0:05-1:03.) The caller thereafter described the suspect's age,

13  height, clothing, and the pickup truck he was driving, and explained that the suspect had

14  returned to his truck, which he had parked at a nearby gas pump. (ECF Nos. 20-3 at

15  1:29-2:57, 20-6 at 0:30.) The caller reported that the suspect had just taken off from the

16  store, and he confirmed that SPD officers were already at the scene.[4] (*Id.* at 3:28-3:37.)

17  During the 911 call, the dispatch officer broadcasted to SPD officers the caller's report

18  of "larceny" at the convenience store and various details about the suspect. (ECF No.

19  20-2 at 4-5.)

20  ///

21  ///

22

23           [3]The following facts are undisputed unless noted otherwise.

24           [4]The SPD dispatch officer also asked the caller whether he had seen any
25  weapons on the male suspect's person. (ECF No. 20-3 at 3:24-3:28.) Williams alleges
    that the caller responded, "[n]o. He just took off." (ECF No. 33 at 5.) Although the audio
    of the 911 call is difficult to decipher, the SPD dispatch logs for this 911 call state, "NEG
26  WPNS ON THE SUSP," suggesting that the caller did not believe the suspect was
    armed. (ECF Nos. 20-2 at 4, 20-3 at 3:28-3:34.)

27

28                                        2

**2.      Officers' First Encounter with Williams and the Initial Pursuit**

By 12:14 AM, Officer Charles Colborn had responded to dispatch's call and arrived at the scene to investigate. (ECF Nos. 20-2 at 4, 20-6 at 0:31-0:35.) With his overhead lights activated, Colborn pulled up behind Williams's pickup truck. As Colborn prepared to exit his patrol vehicle, however, Williams began to drive off and exited the gas station parking lot. (ECF No. 20-6 at 0:38-0:40.) Joined by Officer Vernon Taylor, Colborn gave chase, activated his siren and lights, and notified fellow officers of Williams's flight, noting Williams's speeds between 30 and 45 miles per hour and "no pedestrian traffic" on the roads. (*Id.* at 0:41-1:29.)

During these first few minutes of the pursuit, Williams briefly slowed his truck to about eight miles per hour and eventually stopped for a few seconds, but then took off again after Colborn ordered him to show his hands. (*Id.* at 2:25-3:17.)

Williams quickly gained speed and continued driving away from the Officers, running a red light at a major intersection at about 50 miles per hour. (ECF No. 20-6 at 3:22-4:15.) In the meantime, SPD dispatch had processed Williams's license plate number and broadcasted to the Officers Williams's identity, residence, and criminal history of "battery with a deadly weapon and eluding." (ECF Nos. 20-2 at 5, 20-6 at 3:40-4:05.) By this time, Officer Austin Gibson had also joined the pursuit. (ECF No. 20-2 at 5.)

Williams then turned onto an industrial street "with no traffic, no pedestrians" at about 35 miles per hour, and eventually stopped at the street's dead end. (ECF No. 20-6 at 4:14-4:46.) Taylor then exited his patrol vehicle and screamed, "get your fucking hands up; get out of the vehicle now!" (ECF Nos. 20-2 at 5, 20-6 at 4:47-4:51.) The Officers shouted several commands for Williams to step out of his truck and keep his hands up. (ECF No. 20-6 at 4:49-5:25.) Although Williams placed his head and both hands out of his driver side window and kept his hands raised, he never exited the truck while talking to the Officers. (*Id.* at 4:49-15:24). For over ten minutes, the Officers talked

3

1  with Williams and tried convincing him to exit the vehicle; Williams never got out of the

2  truck while talking to the Officers.[5] (*Id.*) Despite the Officers' efforts, Williams placed his

3  head and hands back in the truck, shouted at the Officers, and drove off again—this

4  time ramming through a chain-link fence and entering an industrial complex.[6] (*Id.* at

5  15:27-15:50.)

6  ### 3.    The Final Leg of the Chase and Shooting

7         The Officers continued pursuing Williams through the industrial complex and

8  back onto the dead-end street. Lieutenant Christopher Rowe, who had arrived to

9  provide backup support during the ten-minute standoff between Colborn, Taylor, and

10  Williams at the dead end, then unsuccessfully attempted the first pursuit intervention

11  technique ("PIT") maneuver as Williams turned onto a major road. (ECF Nos. 20-2 at 5-

12  6, 20-6 at 18:03-18:09.) Although Williams's truck spun 180 degrees—now facing the

13  Officers on the dead-end street—Williams quickly accelerated past the Officers and

14  turned back onto the adjacent major road. (ECF No. 20-6 at 18:07-18:12.)

15         Williams continued fleeing from the Officers for several minutes—running two

16  more red lights—with speeds fluctuating between 35 and 65 miles per hour. (*Id.* at

17  18:15-22:40.) While the Officers continued pursuing Williams, Colborn reported to

18  dispatch "no traffic" on the roads. (*Id.* at 21:15-21:19.) Eventually, Williams ran a third

19  red light and turned onto a freeway entrance ramp. (*Id.* at 22:41-22:43.) While there was

20  light freeway traffic in the opposite direction, there were no other cars travelling on the

21  side of the freeway (*i.e.*, in the same direction) where the pursuit was further

22  developing. (*Id.* at 22:54-23:15.) Once on the freeway, Williams's speed ranged

23

24         [5]Nearly all of Williams's statements during this standoff are either inaudible or
   unintelligible due to the poor audio quality of the body cam and dash cam footage.

25

26         [6]Officer Mateo Terrasas responded to dispatch's call to provide backup support
   seconds after Williams rammed his truck through the chain-link fence in the industrial
   park. (ECF No. 20-2 at 6.)

27

28                                              4

1  between 65 and 70 miles per hour, and the pursuit continued on or near the freeway for

2  approximately 20 more minutes. (*Id.* at 22:41-42:32.)

3        During this leg of the chase, SPD officers also coordinated with the Nevada

4  Highway Patrol to place spike strips on the freeway to immobilize Williams.[7] (ECF Nos.

5  20-2 at 6, 20-6 at 23:26-23:32, 25:04-25:10, 29:08-29:12.) Nearing the spike strips, the

6  Officers collectively backed off from Williams's truck, so that the upcoming spike strips

7  would only impact Williams's truck. (ECF No. 20-6 at 32:35-32:42.) Dispatch confirmed

8  that the spike strips were "effective" after Williams drove over them. (ECF No. 20-2 at

9  7.) Although still driving away from the Officers, Williams slowed down to about 50 miles

10  per hour after the spike strips punctured his front passenger tire. (ECF Nos. 20-2 at 7,

11  20-6 at 35:46-36:20.)

12        Williams then continued driving on the freeway for over three more minutes,

13  swerving between lanes, at about 35 to 45 miles per hour. (ECF No. 20-6 at 36:20-

14  39:59.) Shortly thereafter, the Officers attempted a second PIT maneuver with an SPD

15  patrol truck. (*Id.* at 39:46-39:59.) However, this second attempt was also unsuccessful,

16  and Williams then turned onto a freeway exit ramp. (*Id.* at 39:59-40:06.) Williams ran

17  two stop signs as he briefly exited the freeway and turned back onto the freeway—this

18  time heading in the opposite direction, on the other side of the freeway. (*Id.* at 40:06-

19  40:17.) By this point, sparks had begun flying from Williams's front passenger wheel

20  due to the friction between the road and the rim. (*Id.* at 40:17-40:32.) Once back on the

21  freeway, Williams crossed the dirt median and continued driving on the other side of the

22  freeway (*i.e.*, the original direction of the pursuit). (*Id.* at 40:32-41:01.)

23        Colborn approached the rear driver side of Williams's truck, but then quickly

24  backed off after Williams either suddenly braked or turned toward Colborn's patrol

25

26        [7]Additionally, an SPD officer communicated to his peers that they had "one of
[their] armored vehicles at the back of the pack." (ECF No. 20-6 at 29:49-29:51.)

27

28

vehicle. (*Id.* at 41:08-41:11.) Colborn radioed in, stating that Williams "just tried to ram [him.]"[8] (*Id.* at 41:16-41:18.) Williams continued driving, but this time significantly more sparks began flying from his front passenger wheel. (*Id.* at 41:27-41:31.) Then, after coordinating with Colborn, Rowe executed a third PIT maneuver, which successfully caused Williams to spin about 180 degrees in the median—a graveled dirt ditch—sending dust and rocks flying into the air. (*Id.* at 42:09-42:22.)

Williams continued driving through the dust cloud, but now in the opposite direction, facing the Officers' vehicles. (*Id.* at 42:22-42:24.) Williams attempted driving past the front of Colborn's patrol vehicle, but in doing so, his rear passenger wheel ran over the hood of Colborn's vehicle.[9] (*Id.* at 42:24-42:26.) Williams then momentarily lost control while maneuvering around Colborn, which caused the back of his truck to hit the front of Officer Christopher Bare's patrol vehicle. (ECF No. 20-13 at 37:32-37:35.) Williams's truck eventually stopped once Officer Nathan Janning wedged the hood of his patrol vehicle underneath the truck's undercarriage. (ECF No. 20-16 at 39:04-39:07.) Janning's maneuver pinned Williams's truck against Officer Mateo Terrasas's patrol vehicle, such that Williams and Terrasas were now parallel, flush against each other.[10] (ECF No. 20-11 at 15:49-15:53.) After Williams's truck stopped, Officer Austin Gibson positioned his patrol vehicle near (and facing) the front driver side corner of Williams's truck, near Janning's patrol vehicle. (ECF No. 20-16 at 39:03-39:10.) Williams, now effectively boxed in by Janning, Gibson, and Terrasas, had his engine making a loud,

---

[8]The parties dispute whether Williams tried to "ram" or hit Colborn's vehicle at this moment. (ECF Nos. 20 at 5, 33 at 7.)

[9]The parties appear to dispute whether Williams, in hitting the Officers' vehicles, was trying to avoid hitting the Officers after Rowe's successful PIT maneuver. (ECF Nos. 20 at 5-6, 33 at 7, 33-2 at 2.)

[10]Williams alleges that his truck hit Terrasas's patrol vehicle after he had already stopped because "Janning rammed into the truck's driver[ ] side and further pushed the truck against Terrasas'[s] vehicle . . . and pinned in the truck between [Janning's] vehicle and Terrasas'[s] vehicle." (ECF No. 33 at 7.)

6

1    continuous noise, and a thick cloud formed near the back of Williams's truck and three

2    surrounding patrol vehicles.[11] (ECF Nos. 20-5 at 42:32-42:50, 20-16 at 39:09-39:31.)

3          Within the few seconds after Williams's truck stopped, Officers Colborn, Gibson,

4    Janning, Taylor, and Terrasas all exited their patrol vehicles and shouted commands

5    (e.g., "Stop the car!") while they began firing dozens of rounds into the cabin of the

6    truck. (ECF Nos. 20-5 at 42:31-42:50, 20-6 at 42:32-42:49, 20-11 at 15:53-16:08, 20-16

7    at 39:07-39:23, 20-17 at 39:07-39:20, 20-19 at 37:08-38:23.) Right before shooting

8    toward Williams's driver side door and window, Gibson moved for cover behind the back

9    bumper of his patrol vehicle, away from the front of Williams's truck and toward its driver

10   side. (ECF No. 20-17 at 39:07-39:24.) Janning fired his rounds from behind his patrol

11   vehicle, which he had positioned to perpendicularly face Williams's driver side. (Id. at

12   39:10-39:19.) Colborn fired rounds from behind Williams's truck, toward the rear

13   window. (ECF No. 20-5 at 42:33-42:45.) Terrasas fired rounds toward the truck's rear

14   window as he walked from his patrol vehicle—flush against Williams's passenger side—

15   toward the truck's rear passenger corner. (ECF No. 20-11 at 15:55-16:04.) Taylor began

16   firing toward Williams's passenger side, while taking cover from behind his patrol

17   vehicle, positioned parallel to both Williams and Terrasas. (ECF No. 20-19 at 37:09-

18   38:23.)

19         The Officers fired many rounds for approximately 15 seconds while Williams's

20   engine continued making a loud noise. (ECF No. 20-5 at 42:35-42:50.) Williams asserts

21   that when he saw the Officers pointing their guns at him, he "tried to lower [his] body in

22   the truck." (ECF Nos. 33 at 7, 33-2 at 2.) The noise from Williams's engine continued

23   until about 50 seconds after the Officers stopped shooting. (ECF Nos. 20-5 at 42:47-

24   _____

25         [11]Defendants assert that Williams spun his tires while he revved the truck's
     engine attempting to flee toward Gibson. (ECF No. 20 at 6-7.) While a cloud did form
26   around the car—perhaps due to spinning rear tires or a malfunctioning engine—
     Gibson's dash cam footage does not clearly show whether Williams's wheels were
27   spinning while his engine made a loud, continuous noise and the Officers fired rounds.
     (ECF No. 20-16 at 39:07-39:23.)

28                                           7

1   43:45, 20-15 at 16:10-17:02.) Several bullets struck and injured Williams. (ECF No. 1 at

2   7.)

3           A few minutes after the Officers stopped shooting, they coordinated a plan to

4   deploy a 40-millimeter less-lethal launcher to punch out the truck's back window so that

5   Williams could exit the vehicle. (ECF No. 20-14 at 41:54-43:40.) The plan was

6   unsuccessful, and Terrasas then moved his patrol vehicle away from Williams's

7   passenger door to allow Williams to exit the truck, as Rowe instructed. (ECF No. 20-5 at

8   52:09-55:30.) Williams, injured, opened the passenger door, asked the Officers to give

9   him a second, and then lay on the ground after a tense exchange of words. (ECF Nos.

10  20-2 at 8, 20-5 at 56:07-57:34.) With help from another SPD officer, Colborn then

11  approached Williams (bloody and now lying on the ground), placed him in handcuffs, sat

12  Williams up, and asked him, "where are you hit?" (ECF No. 20-5 at 57:36-58:31.) The

13  expedited paramedics arrived about 15 minutes after the Officers opened fire, and then

14  transported him to a hospital. (ECF No. 20-2 at 7-8.)

15          **B.    This Action**

16          Williams asserts seven claims: (1) excessive force; (2) denial of medical care;[12]

17  (3) municipal liability for ratification; (4) municipal liability for inadequate training; (5)

18  municipal liability for "unconstitutional custom, practice, or policy"; (6) battery; and (7)

19  negligence. (ECF No. 1.) The factual predicate supporting these claims stem from the

20  shooting. In gist, Williams challenges the Officers' use of deadly force when they fired

21  

22          [12]Williams has voluntarily withdrawn his Fourth Amendment denial of medical
    care claim. (ECF No. 33 at 4 n.1.) A plaintiff may not voluntarily withdraw claims after
23  the defendant has filed a motion for summary judgment without first obtaining leave of
    the Court. Fed. R. Civ. P. 41(a)(1)(A)(i). Accordingly, the Court construes Williams's
    response as a motion for voluntary dismissal, which the Court now grants. *See* Fed. R.
24  Civ. P. 41(a)(2) (instructing the Court, in granting a plaintiff's motion for voluntarily
    withdrawal, to dismiss claims without prejudice unless the order states otherwise).
25  Because "[t]he decision to grant a voluntary dismissal under Rule 41(a)(2) is addressed
    to the sound discretion of the District Court," the Court grants Williams's motion for
26  voluntary dismissal and dismisses Claim 2 without prejudice. *Hamilton v. Firestone Tire
    & Rubber Co., Inc.*, 679 F.2d 143, 145 (9th Cir. 1982).

27  

28                                              8

1    dozens of lethal rounds and additional 40-millimeter foam rounds at him while he was

2    "trapped and injured inside his vehicle," "visibly unarmed and not posing a threat of

3    harm to any person or officer." (*Id.* at 8-9.)

4    **III.    DISCUSSION**

5        Two motions are before the Court. First is Defendants' motion for summary

6    judgment (ECF No. 20), involving all seven of Williams's claims. Second is Defendants'

7    partial motion to dismiss (ECF No. 17), which addresses only the municipal liability

8    claims. The Court addresses each motion in turn.

9        **A.  Defendants' Motion for Summary Judgment**

10            **1.    Fourth Amendment Excessive Force (Claim 1)**

11        Defendants first argue they did not violate Williams's Fourth Amendment rights

12    because their use of deadly force at the end of the pursuit was reasonable. (*Id.* at 10-

13    16.) Defendants alternatively argue that even if the Officers' use of force was

14    unreasonable, they are nevertheless entitled to qualified immunity because their actions

15    did not violate clearly established law. (*Id.* at 15-16.) Crucial to Defendants' argument is

16    their version of the seconds before the shooting occurred—*i.e.*, "[t]he fact the officers

17    shot at [Williams] multiple times while he was actively attempting to run over an officer

18    and flee . . ." (ECF No. 20 at 15; at 6 (". . . and the [truck] engine revved while Plaintiff

19    attempted to drive his vehicle into Officer Gibson's direction"; at 7 (the Officers "fired at

20    Plaintiff while Plaintiff attempted to flee with the truck in Officer Gibson's direction")).

21    Plaintiff disputes Defendants' account of the facts, contending that the truck was

22    immobile and not capable of moving at the time the Officers fired the lethal rounds.

23    (ECF No. 33 at 15-16.) Viewing the facts in the light most favorable to Plaintiff and

24    drawing all reasonable inferences in his favor, the Court agrees with Plaintiff that triable

25    issues of material fact preclude summary judgment.

26

27

28                                                                    9

1   The Court first addresses Defendants' argument that their use of force was not

2   excessive in violation of Williams's Fourth Amendment rights. The Court then addresses

3   Defendants' qualified immunity arguments.

4   **a.      Excessive Force Claim**

5   "Excessive force claims are founded on the Fourth Amendment right to be free

6   from unreasonable seizures of the person." *Shafer v. Cnty. of Santa Barbara*, 868 F.3d

7   1110, 1115 (9th Cir. 2017) (citing U.S. Const. amend. IV and *Graham v. Connor*, 490

8   U.S. 386, 394-95 (1989)). "Determining whether the force used to effect a particular

9   seizure is 'reasonable' under the Fourth Amendment requires a careful balancing of 'the

10  nature and quality of the intrusion on the individual's Fourth Amendment interests'

11  against the countervailing governmental interests at stake." *Graham*, 490 U.S. at 396

12  (quoting *Tennessee v. Garner*, 471 U.S. 1, 8 (1985)). "The 'reasonableness' of a

13  particular seizure depends not only on *when* it is made, but also on *how* it is carried

14  out." *Graham*, 490 U.S. at 395. When assessing reasonableness, courts must allow for

15  the fact that "police officers are often forced to make split-second judgments—in

16  circumstances that are tense, uncertain, and rapidly evolving—about the amount of

17  force that is necessary in a particular situation." *Id.* at 396-97. Accordingly, "[e]xcessive

18  force claims . . . are evaluated for objective reasonableness based upon the information

19  the officers had when the conduct occurred." *Saucier v. Katz*, 533 U.S. 194, 207 (2001).

20  The appropriate question is "whether the officers' actions are 'objectively reasonable' in

21  light of the facts and circumstances confronting them, without regard to their underlying

22  intent or motivation." *Graham*, 490 U.S. at 397.

23  When evaluating the strength of the government's interest in the force used,

24  courts consider "'the type and amount of force inflicted,'" as well as three factors as

25  outlined in *Graham v. Connor*: "'(1) the severity of the crime at issue, (2) whether the

26  suspect posed an immediate threat of safety of the officers or others, and (3) whether

27  the suspect was actively resisting arrest or attempting to evade arrest by flight.'" *O'Doan*

28  10

*v. Sanford*, 991 F.3d 1027, 1037 (9th Cir. 2021) (quoting *Miller v. Clark Cnty.*, 340 F.3d 959, 964 (9th Cir. 2003)). "Among these considerations, the 'most important' is the second factor—whether the suspect posed an immediate threat to others." *Williamson v. City of Nat'l City*, 23 F.4th 1146, 1153 (9th Cir. 2022) (citation omitted).

But these three *Graham* factors are "not exclusive." *O'Doan*, 991 F.3d at 1033. "Other factors relevant to the reasonableness of force 'include the availability of less intrusive alternatives to the force employed, whether proper warnings were given and whether it should have been apparent to officers that the person they used force against was emotionally disturbed.'" *Isayeva v. Sacramento Sheriff's Dep't*, 872 F.3d 938, 947 (9th Cir. 2017) (quoting *Glenn v. Washington Cnty.*, 673 F.3d 864, 870 (9th Cir. 2011)). Although law enforcement officers "need not avail themselves of the least intrusive means of responding to an exigent situation," they are "required to consider [w]hat other tactics if any were available." *Glenn*, 673 F.3d at 876 (internal quotations and citations omitted). "[I]f there were 'clear, reasonable and less intrusive alternatives' to the force employed, that 'militate[s] against finding [the] use of force reasonable.'" *Id.* (quoting *Bryan v. MacPherson*, 630 F.3d 805, 831 (9th Cir. 2010)).

The Ninth Circuit has repeatedly cautioned that "summary judgment should be granted sparingly in excessive force cases." *Est. of Lopez by and through Lopez v. Gelhaus*, 871 F.3d 998, 1006 (9th Cir. 2017).

In light of such caution, the Court finds that several material factual disputes preclude granting summary judgment. Critically, the parties dispute whether Williams was capable of further flight and attempting to flee and drive off in Gibson's direction when the Officers opened fire, just a few seconds after Gibson, Janning, and Terrasas had pinned Williams's truck with their patrol vehicles. (ECF Nos. 20 at 6-7, 33 at 8-9, 15-16.) This factual dispute dispositively shapes the Court's analysis of the second ("most important") *Graham* factor, that is, whether Williams posed an immediate safety threat to the Officers and to others once the three Officers had boxed in his truck. *See*

*Williamson*, 23 F.4th at 1153. If Williams had attempted to accelerate and drive off in Gibson's direction as Defendants described—evidenced in part by spinning tires and the relative positions of Williams, Williams's truck, and Gibson—right before the Officers fired, it would have been reasonable for them to use deadly force to prevent harm to Gibson or others. *See Plumhoff v. Rickard*, 572 U.S. 765, 776-77 (2014) (concluding that officers' use of deadly force in a high-speed chase was reasonable where, "despite the efforts of the police to block [the suspect's] path," "[j]ust before the shots were fired, when the front bumper of [the suspect's] car was flush with that of one of the police cruisers, [he] was obviously pushing down on the accelerator because the car's wheels were spinning, and then [he] threw the car into reverse in an attempt to escape"); *Monzon v. City of Murrieta*, 978 F.3d 1150, 1163 (9th Cir. 2020) (holding that police officers "acted reasonably under the circumstances" where they opened fire on a fleeing suspect when, "while in close quarters steered [his] van in the direction of and among officers on foot," "accelerated toward them, and threatened their safety"); *Wilkinson v. Torres*, 610 F.3d 546, 549, 551-53 (9th Cir. 2010) (finding an on-foot police officer's use of deadly force reasonable because he "was standing in a slippery yard with [the suspect's] minivan accelerating around him," and because the minivan's "tires were spinning, mud was flying up, and a fellow officer was nearby either lying fallen on the ground or standing but disoriented," at risk of getting run over).

Contrary to Defendants' version of events, the Officers' body cam and dash cam recordings do not clearly show that Williams was either turning or attempting to accelerate in Gibson's direction, spinning his tires, or even moving the truck at all. (ECF Nos. 20-5 at 42:31-42:50, 20-6 at 42:32-42:49, 20-11 at 15:53-16:08, 20-16 at 39:07-39:23, 20-17 at 39:07-39:20, 20-19 at 37:08-38:23.) In looking at the relevant recordings during the seconds before the shooting, the Court does not see what Defendants claim occurred, *i.e.*, Williams trying to accelerate and attempting to flee in Gibson's direction. Indeed, the thick cloud that formed during these crucial few seconds further affects the

1   visibility such that one cannot clearly see what actually transpired. Moreover, Gibson's

2   body cam footage shows that he opened fire while walking behind and toward the back

3   of his patrol vehicle, away from the front of Williams's truck. (ECF No. 20-17 at 39:07-

4   39:24.)

5       Viewing the facts in the light most favorable to Williams and drawing all

6   reasonable inferences in his favor, the Court assumes that Williams's truck was

7   immobile and incapable of further flight, did not have its tires spinning, and was neither

8   turning nor accelerating toward Gibson when the Officers opened fire, and also infers

9   that the noise coming from the truck's engine was not a result of Williams trying to

10  accelerate. When considering Williams's version of events, a reasonable juror could find

11  that Williams was posing no immediate safety threat to the Officers or others at the

12  moment the Officers opened fire, and that the Officers' use of deadly force was

13  unreasonable under the circumstances in that specific moment. *See Orn v. City of*

14  *Tacoma*, 949 F.3d 1167, 1174-75 (9th Cir. 2020) (affirming denial of summary judgment

15  for a defendant police officer, noting that "[a] moving vehicle can of course pose a threat

16  of serious physical harm, but only if someone is at risk of being struck by it," and finding

17  that the police officer, upon shooting toward the suspect's moving vehicle, "could not

18  reasonably have feared for his own safety" because he ran toward the vehicle and

19  opened fire "as it was traveling away from him"); s*ee also Villanueva v. California*, 986

20  F.3d 1158, 1170-71 (9th Cir. 2021) (finding that "a reasonable jury could conclude that

21  the [defendant police o]fficers used excessive force, because they 'lacked an objectively

22  reasonable basis to fear for their own safety, as they could simply have stepped back or

23  to the side to avoid being injured,'" where the fleeing suspect's truck was positioned "15

24  to 20 feet away from the [o]fficers" and "not aimed directly at [an officer] and was

25  moving very slowly and not accelerating when the Officers began shooting") (quoting

26  *Orn*, 949 F.3d at 1179, and citing *Acosta v. City & Cnty. of S.F.,* 83 F.3d 1143, 1146

27

28                                                13

1  (9th Cir. 1996), as amended (June 18, 1996), *abrogated on other grounds by Saucier v.*
2  *Katz*, 533 U.S. 194 (2001)) (alterations omitted).

3        Even assuming (1) the underlying offenses (larceny, battery, evading arrest)
4  were sufficiently "severe," (2) the Officers' orders to stop the car and put hands up as
5  they opened fire constituted proper warnings, and (3) the Officers reasonably and
6  genuinely did not know that Williams was no longer a flight risk when they began
7  shooting—all of which are reasonably disputed—the factual disputes about the threat
8  Williams posed to the Officers once they blocked his truck and began shooting preclude
9  summary judgment in Defendants' favor.[13]

10                    **b.    Qualified Immunity**

11       Defendants alternatively argue that even if the force used was excessive, they
12 are entitled to qualified immunity because their conduct did not violate clearly
13 established law. (ECF No. 20 at 15-16.) Because the Court views the facts in the light
14 most favorable to Williams, it considers whether the Officers would be entitled to
15 qualified immunity in the context of the facts as Williams presented. That is, had
16 Williams been immobile and incapable of further flight, had he been trying to avoid
17 hitting the Officers' vehicles, had he not been revving his engine in efforts to accelerate,
18 and had he not been turning or moving his car in Gibson's direction. (ECF No. 33-2.)

19       "In determining whether a state official is entitled to qualified immunity in the
20 context of summary judgment, [courts] consider (1) whether the evidence viewed in the
21 light most favorable to the plaintiff is sufficient to show a violation of a constitutional right
22 and (2) whether that right was 'clearly established at the time of the violation.'" *Sandoval*
23 *v. Cnty. of San Diego*, 985 F.3d 657, 670 (9th Cir. 2021) (quoting *Horton by Horton v.*

24

_____

25       [13]Accordingly, the Court declines to reach Williams's excessive force argument
    concerning the number of the Officers' lethal rounds. (ECF No. 33 at 16-17.) The Court
26 also declines to reach Defendants' excessive force argument concerning the Officers'
    use of the 40-millimeter less-lethal foam launcher to break Williams's truck window after
27 using deadly force. (ECF No. 20 at 16.)

28                                    14

*City of Santa Maria*, 915 F.3d 592, 592 (9th Cir. 2019)). "Whether a constitutional right is clearly established is purely a question of law for the court to decide." *Gordon v. Cnty of Orange*, 6 F.4th 961, 968 (9th Cir. 2021). A defendant is not entitled to qualified immunity "simply because 'the very action in question has [not] previously been held unlawful.'" *Sandoval*, 985 F.3d at 680 (quoting *Hope v. Pelzer*, 536 U.S. 730, 739 (2002)).

Courts must not define clearly established law "at too high a level of generality." *City of Tahlequah, Okla. v. Bond*, 142 S.Ct. 9, 11 (2021). A rule that is "suggested" by precedent is not enough; instead, "the rule's contours must be so well defined that it is 'clear to a reasonable officer that his conduct was unlawful in the situation he confronted.'" *Id.* (quoting *D.C. v. Wesby*, 183 S.Ct. 577, 590 (2018)). A plaintiff need not identify prior cases that are "'directly on point.'" *Orn*, 949 F.3d at 1178 (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011)). Instead, they must "identify precedent that holds 'certain conduct is a constitutional violation under facts not distinguishable in a fair way from the facts presented in the case at hand.'" *Id.* (quoting *Saucier*, 533 U.S. at 202.) In other words, "[a] right is clearly established when it is 'sufficiently clear that every reasonable official would have understood that what he is doing violates that right.'" *Rivas-Villegas v. Cortesluna*, 142 S.Ct. 4, 7-8 (2021) (per curiam) (quoting *Mullenix v. Luna*, 577 U.S. 7, 11-12 (2015) (per curiam)). The reviewing court must consider the qualified immunity analysis "in light of the specific context of the case, not as a broad general proposition." *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004) (per curiam).

Williams has identified several Ninth Circuit decisions that, he argues, put the Officers on notice that their specific conduct—*i.e.*, "shooting at a slow-moving or stationary vehicle that poses no immediate threat of death or seriously bodily injury"—

1  was unlawful. (ECF No. 33 at 19-21.) *See also*, *e.g.*, *Villanueva*, 968 F.3d at 1170-72;

2  *Orn*, 949 F.3d at 1174-75; *Acosta*, 83 F.3d at 1146-47.[14]

3          Viewing the facts in the light most favorable to Williams, the Court agrees that the

4  Officers were on notice that using deadly force on an individual in a stationary vehicle—

5  not facing, turning, or moving in a police officer's direction—was unlawful as of May 5,

6  2020, the date of the incident. Bolstering this conclusion is Ninth Circuit precedent

7  finding officers' use of deadly force unreasonable in situations where a suspect's car

8  was moving slowly—situations that pose a more immediate risk than those with a

9  stationary vehicle like Williams's truck. *See Orn*, 949 F.3d at 1174-75 (finding a police

10 officer's use of deadly force unreasonable where the suspect's vehicle was "moving at

11 just five miles per hour," and the officer "could therefore have avoided any risk of being

12 struck by simply taking a step back"); *Acosta*, 83 F.3d at 1146 (finding that a reasonable

13 police officer "would have recognized that he could avoid being injured when the car

14 moved slowly, by simply stepping to the side").

15         Unlike in *Plumhoff*, (resolving factual disputes in Williams's favor) Williams was

16 not "obviously pushing down on the accelerator because the car's wheels were

17 spinning," nor did he "thr[o]w his car into reverse in an attempt to escape" after Gibson,

18 Janning, and Terrasas pinned in and immobilized him. 572 U.S. at 776-77. Moreover, it

19 is far from clear whether Williams "never abandoned his attempt to flee" during the 15-

20 second timeframe in which the Officers fired their dozens of rounds. (ECF Nos. 20-5 at

21 42:31-42:50, 20-6 at 42:32-42:49, 20-11 at 15:53-16:08, 20-16 at 39:07-39:20, 20-17 at

22 39:07-39:20, 20-19 at 37:08-38:23.) *See also id.* at 777. According to Williams's version

23 of events, he did not attempt to flee after the Officers immobilized him. (ECF Nos. 33 at

24

25         [14]Among the Ninth Circuit decisions that Williams identifies to demonstrate
   "clearly established law" for qualified immunity purposes, the Court will not consider
26 *Monzon* or *Villanueva* because they were decided after May 5, 2020. "Because the
   focus is on whether the officer had fair notice that her conduct was unlawful,
27 reasonableness is judged against the backdrop of the law at the time of the conduct."
   *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004) (per curiam).

28                                               16

8, 17, 33-2 at 2-3.) Like in *Orn*, Gibson—the Officer closest to the truck's front bumper—was not within the truck's direct path of travel; he quickly retreated toward the back of his patrol vehicle as he began shooting, away from the truck's front bumper. (ECF No. 20-17 at 39:07-39:20.) *See also* 949 F.3d at 1174-75. Thus, a reasonable juror could conclude that Gibson "could not reasonably have feared for his safety" when he opened fire while walking away from the stationary truck. *See id.* And like in *Acosta*, Gibson "positioned himself facing the driver so that he was standing closer to the [driver] side than the dead-center of the car," such that he "would have recognized that he could avoid being injured [if] the car moved slowly, by simply stepping to the side." (*Id.*) *See also* 83 F.3d at 1146.

These key facts remain in dispute, and it is possible the rational factfinder will determine that Williams did in fact threaten the Officers, that their decision to shoot him was justified, and that would compel this Court to find that qualified immunity attaches. But the rational factfinder could reasonably reach a contrary conclusion. Accordingly, Defendants are not entitled to summary judgment on their qualified immunity defense, and the Court will deny their motion as to Claim 1.

## 2.    Negligence (Claim 7)

Williams alleges that Defendants are liable for negligence due to their failure to train and supervise the Officers as well as the Officers' failure to properly assess the situation, deploy tactics, and their overall handling of the incident (*e.g.*, use of deadly force, detention, arrest). (ECF No. 1 at 20-22.)

Defendants argue they cannot be liable for negligence because, first, they owed no duty of care to Williams, and second, the Officers' discretionary acts are statutorily immune under NRS § 41.032(2) to the extent the claim addresses actions unrelated to the Officers' use of deadly force. (ECF Nos. 20 at 21-25, 35 at 14-15.) *See also Martinez v. Maruszczak*, 168 P.3d 720, 728-29 (Nev. 2020) (creating two-prong test to determine whether a state actor's decisions are entitled to discretionary-act immunity

under NRS § 41.032(2)); *but see Est. of Brenes v. Las Vegas Metro. Police Dep't*, 468 P.3d 368 (Nev. 2020) (unpublished) (concluding that police officers "were not shielded by discretionary-function immunity" insofar as the plaintiffs sought to hold the defendants liable for an officer's decision to use deadly force).

Williams does not respond to either argument; instead, he responds that summary judgment must be denied on the negligence claim because "there is a genuine factual dispute as to whether the force used by defendant officers was excessive." (ECF No. 33 at 26). But this vague response is essentially a non-response. The Court therefore agrees with Defendants that Williams has failed to respond and, in turn, has essentially consented to the granting of summary judgment on his negligence claim to the extent that the claim is based on Defendants' negligent hiring, training, and supervision decisions unrelated to their use of deadly force. (ECF No. 35 at 14.) *See also Paulos v. FCH1, LLC*, 456 P.3d 589, 591, 596 (Nev. 2020) (concluding that a police department's decision to hire and train a defendant police officer—who caused a woman to suffer second- and third-degree burns while attempting to arrest her on hot asphalt—was protected under Nevada's discretionary immunity doctrine under NRS § 41.032(2)).

### 3.    Battery and *Monell* claims (Claims 3 through 6)

As further explained below, the Court will also deny Defendants' motion for summary judgment as to the battery and *Monell* claims.

Williams asserts that the City is liable under § 1983 through the municipal liability doctrine set forth in *Monell v. Department of Social Services*, 436 U.S. 658 (1978), as alleged in three separate claims—ratification (Claim 3), failure to train (Claim 4), and "unconstitutional custom, practice, or policy" (Claim 5). (ECF No. 1 at 12-19.) Defendants only argue they are entitled to summary judgment on all three *Monell* claims if the Court finds that the Officers used reasonable force and therefore did not violate Williams's constitutional rights. (ECF No. 20 at 18-19.) But because the Court finds that

18

triable issues of material fact preclude summary judgment on Williams's excessive force claim, the Court similarly denies summary judgment on the *Monell* claims (Claims 3 through 5).

Similarly, Defendants briefly argue that the Officers cannot be liable for battery because their use of force was objectively reasonable. (*Id.* at 19-21.) "Under Nevada law, police officers 'are privileged to use that amount of force which reasonably appears necessary,' and are liable only to the extent they use more force than reasonably necessary." *Tuuamalemalo v. Greene*, 946 F.3d 471, 478 (9th Cir. 2019) (quoting *Ramirez v. City of Reno*, 925 F. Supp. 681, 691 (D. Nev. 1996)). "The standard for common-law assault and battery by a police officer thus mirrors the federal civil rights law standard: Liability attaches at the point at which the level of force used by a peace officer exceeds that which is objectively reasonable under the circumstances." *Ramirez*, 925 F. Supp. at 691. But there remains a genuine dispute of material fact as to whether the level of force the Officers used was reasonably necessary under the circumstances. For similar reasons the Court denies summary judgment on Williams's excessive force claim, the Court likewise denies summary judgment on the battery claim.

## B.   Defendants' Partial Motion to Dismiss (ECF No. 17)

Defendants have also filed a partial motion to dismiss, wherein they assert that Williams incorrectly pleads his *Monell* claim as three separate causes of action in his complaint. (ECF No. 17.) Defendants ask the Court to dismiss two of Williams's three *Monell* claims as duplicative and order Williams to amend his complaint to assert only one *Monell* claim for various theories of liability. (*Id.* at 6-7.) The Court agrees with Defendants. This Court has recently held that a plaintiff's multiple *Monell* claims were "duplicative," and has instructed that a party "may only assert one *Monell* claim, though she may assert various theories of liability." *Brizuela v. City of Sparks*, Case No. 3:19-cv-00692-MMD-WGC, 2021 WL 4150936, at *6 (D. Nev. Sept. 13, 2021.) Accordingly, the Court grants Defendants' partial motion to dismiss and will grant Williams leave to

1  file an amended complaint to assert multiple theories of liability under just one *Monell*

2  claim. *See* Fed. R. Civ. P. 15(a)(2) ("The court should freely give leave when justice so

3  requires."); *ASARCO, LLC v. Union Pac. R.R. Co.*, 765 F.3d 999, 1005 (9th Cir. 2014)

4  ("Rule 15's purpose is to provide maximum opportunity for each claim to be decided on

5  its merits rather than on procedural technicalities.")

6  **IV.   CONCLUSION**

7  The Court notes that the parties made several arguments and cited to several

8  cases not discussed above. The Court has reviewed these arguments and cases and

9  determines that they do not warrant discussion as they do not affect the outcome of the

10  motions before the Court.

11  It is therefore ordered that Defendants' motion for summary judgment (ECF No.

12  20) is granted as to Williams's negligence claim (Claim 7) and denied as to his

13  remaining claims. The Court further dismisses Williams's Fourth Amendment denial of

14  medical care claim (Claim 2).

15  It is further ordered that Defendants' partial motion to dismiss (ECF No. 17) is

16  granted. Williams has 15 days to file an amended complaint to allege a single *Monell*

17  claim.

18  DATED THIS 24th Day of March 2023.

19

20

21  _____
    MIRANDA M. DU

22  CHIEF UNITED STATES DISTRICT JUDGE

23

24

25

26

27

28                                    20